FILED

05/06/2021

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 10, 2021 Session

## LIZANDRO GUEVARA v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2009-D-3488    Steve R. Dozier, Judge**

_____

### No. M2020-00118-CCA-R3-PC

_____

In 2011, a Davidson County jury convicted the Petitioner, Lizandro Guevara, of eight counts of aggravated sexual battery and four counts of rape of a child, and the trial court sentenced him to sixty-nine years of incarceration. The Petitioner appealed, and our court affirmed the convictions. *State v. Lizandro Guevara*, No. M2015-01719-CCA-R3-CD, 2016 WL 5266552 (Tenn. Crim. App., at Nashville, Sept. 21, 2016), *perm. app. denied*. Subsequently, the Petitioner filed a petition for post-conviction relief, claiming that he received the ineffective assistance of counsel, which the post-conviction court denied after a hearing. The Petitioner appealed, and, after review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Jonathan W. Turner, Franklin, Tennessee, for the appellant, Lizandro Guevara.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; Jan Norman and J. Wesley King, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION
### I. Facts and Background

This case originates from the Petitioner's sexual abuse of the minor victim, his wife's daughter, in the home they shared. Based on these events, a Davidson County grand jury indicted the Petitioner for eight counts of aggravated sexual battery and four counts of rape of a child.

# A. Trial

This court summarized in its opinion the facts presented at trial:

A.C. was eleven years old at trial. [The Petitioner] was married to A.C.'s mother ["Mother"]. Neither A.C. nor her younger brother was [the Petitioner's] biological child. She began living with [the Petitioner] when she was approximately four or five years old. Eventually, Mother and [the Petitioner] had a daughter together.

Mother and [the Petitioner] moved in together on April 15, 2005, and they shared a house with other family members. A.C., her younger brother, and her younger sister (once born) lived downstairs with Mother and [the Petitioner]. [The Petitioner's] sister, her three children, and her husband lived upstairs. The upstairs and downstairs portions of the home were separated.

A.C. recalled that the first instance of abuse occurred when she was five years old while her mother was assisting her little brother in the bathroom. [The Petitioner] called A.C. to him while he was sitting on "the big sofa" in the living room. When A.C. went to [the Petitioner], he touched her genital area with his hands on the outside of her clothes. [The Petitioner] did not say anything to A.C., and no one else was in the living room. [The Petitioner] stopped touching A.C. when her mother exited the bathroom.

[The Petitioner] then began routinely molesting A.C. A.C. described three different occasions on which [the Petitioner] touched her genital area with his penis. One time in the living room, [the Petitioner] "used his bottom private part, and he put it in [her] private part." [The Petitioner] touched her with his penis both inside and outside her clothes. One time in A.C.'s bedroom, [the Petitioner] touched her genital area "inside [her] clothes, on the skin with his penis." One time in [the Petitioner's] bedroom, [the Petitioner] used his penis to touch the outside of A.C.'s genital area "kind of both" inside and outside her clothes.

A.C. recalled these encounters happening more than twice in each room. On all of these occasions, [the Petitioner] would initiate the contact by touching A.C.'s breasts, buttocks, and genital area with his hands. Other than the first time, A.C.'s mother would be at work when the incidents occurred.

2

When A.C. was six or seven, they moved to a different house. At this residence, [the Petitioner's] brother and his girlfriend lived with them, as well as [the Petitioner's] mother. A.C. testified that [the Petitioner] touched her on numerous occasions in his bedroom. He would touch her buttocks with his hands and "usually" would touch her genital area with his penis. [The Petitioner] would touch her with his penis both on the outside and inside of her clothes but "usually" the contact was on the outside of her genitalia. However, the victim stated that, on more than one occasion, [the Petitioner] penetrated the inside of her genitalia.

These encounters occurred less frequently than every day but more than once a week. During the encounters, [the Petitioner] would ask A.C. if what he was doing to her felt good. On occasion, [the Petitioner] ejaculated onto A.C.'s genital area, and she would "go to the bathroom and wipe it off." Sometimes, [the Petitioner] would move A.C's hand along his penis, and sometimes A.C. touched his penis on her own.

A.C. and her family moved again in early 2009, and [the Petitioner] continued the same behavior, but in that house, he would use his bedroom and his brother's bedroom. When they moved to this third location, [the Petitioner] began making A.C. wear "skirts without shorts," although she also wore panties. [The Petitioner] touched A.C.'s genital area with his penis underneath her clothing on more than one occasion in his brother's bedroom, but the victim was "not sure" if he ever penetrated her in that room. Inside his own room, [the Petitioner] routinely touched A.C.'s genital area with his hands and his penis underneath her clothing. At least once, he penetrated her, but A.C. could not recall where they were in the house.

At the second and third houses, [the Petitioner] also made A.C. "suck his private part." When this happened, A.C. would "usually taste some nasty stuff" that came out of his penis. If [the Petitioner] tried to make A.C. "suck it" and she did not want to, he would pull her hair. In response to specific questioning, A.C. confirmed that [the Petitioner] penetrated her with his penis and also penetrated her with his hand in his bedroom at the second house. A.C. also confirmed that on more than one occasion, [the Petitioner] put his private part "inside" her buttocks, but she could not recall where that happened. A.C. said that there were occasions when her younger brother walked into the room when she was in bed with [the Petitioner]. A.C. remembered that her last encounter with [the

3

Petitioner] was the same week that she disclosed the abuse.

When A.C. was eight or nine years old and in the third grade, she saw a "play about a guy trying to touch a girl." Afterward, she told a friend what [the Petitioner] was doing to her, and the friend encouraged her to tell the counselor at school. Pat Kellogg was the school counselor at A.C.'s elementary school. She organized and attended the awareness presentation in the school cafeteria and watched the reaction of the students after the play. She noticed A.C. crying and approached her with one of the actresses. A.C. "was just very shaken up, and she couldn't really talk very well." The actress said that A.C. had some things to tell Ms. Kellogg, but A.C. was "crying so hard . . . her body was shaking."

A.C. went with her friend to tell the counselor, and "a whole bunch of people came to the school and started asking [her] questions." A.C. explained that she waited to tell someone what was happening "because [the Petitioner] made [her] momma happy, and . . . he was the father to [her] sister."

Ms. Kellogg took A.C. and the actress to the parent conference room and attempted to calm A.C. Eventually, A.C. told Ms. Kellogg that "her stepfather put his body parts in her body parts," and Ms. Kellogg called the Department of Children's Services (DCS). The DCS representative arrived shortly before the school's dismissal time and informed Ms. Kellogg that A.C. would have to be released to [the Petitioner]. Ms. Kellogg objected, and the DCS representative explained that she would follow [the Petitioner] and A.C. home to investigate. Ms. Kellogg described what followed, "I'll never forget . . . the look on her face in that car. It was just like she was, I don't know, like she was just in despair, like she had lost hope."

Mother testified that [the Petitioner] worked part-time as a construction laborer and would frequently be home with her children in the afternoons while she was at work. At the second house, [the Petitioner's] brother and his girlfriend rarely interacted with A.C.'s family. The only time they were in the same part of the house was when they used the bathroom. Mother left her children in the care of [the Petitioner's] brother's girlfriend on only one occasion, and no men were home during that time.

Mother testified that after the investigation occurred, she confronted [the Petitioner] about the incident while A.C. and her brother were present.

4

Mother asked A.C., "Did he do that to you?" and she said, "Yes." Mother then asked A.C.'s brother, "Did he do that to your sister?" and he said, "Yes." When Mother questioned [the Petitioner], he "only put his head down." Mother understood [the Petitioner's] response to mean "that everything was true."

Beverly Cotton, a pediatric nurse practitioner at a medical clinic that specialized in medical forensic exams for children, testified as an expert in pediatric nursing. Ms. Cotton performed a forensic examination of A.C. and collected physical specimens with a "rape kit" on May 1, 2009. The medical record reflected that A.C. appeared to be without distress. She reported "some pain with urination," which she said typically occurred if she did not clean herself well. Ms. Cotton explained that A.C.'s reported urinary pain was not indicative of sexual abuse because it may have existed for other reasons. Ms. Cotton testified that A.C.'s genital exam was normal with no signs of injury. Ms. Cotton explained that such results were typical in child abuse cases, even in cases of reportedly long-term abuse.

The medical record also reflected that A.C. reported that her stepfather touched her private part and pointed to her genital area. A.C. said that she was touched more than one time and thought that the first time it occurred was in 2006. Regarding the first time, A.C. explained that her mother was in the bathroom when [the Petitioner] touched her genital area with his private part. [The Petitioner] was "shaking" and asked, "Does it feel good?"

A.C. volunteered that [the Petitioner] sometimes made her "lick that private thing." She also revealed that [the Petitioner] would pull her hair if she did not want to "lick" him. A.C. said that "little slimy stuff" would come out of [the Petitioner's] private and sometimes she could feel it in her private parts. A.C. said that [the Petitioner's] conduct only hurt her "when he rubs it in there a lot." She denied experiencing any bleeding and said that sometimes [the Petitioner] touched her inside and sometimes outside of her private part. A.C. stated that [the Petitioner] also touched her breasts with his hands. A.C. further reported that she was worried that a "test" would not confirm that she was being truthful and that she was worried that her mother would be mad at her.

A sperm sample was obtained from two inner labial swabs taken from A.C. Forensic DNA analyst Barbara Leal performed DNA testing on the sperm samples, which contained both epithelial cells and sperm cells.

5

For the first swab, testing on the epithelial cells was inconclusive because there was not enough DNA material. The sperm cells produced a partial DNA profile that could not exclude [the Petitioner] as a contributor. Ms. Leal explained that this result meant that the DNA in the sperm cells came from a male in [the Petitioner's] paternal lineage.

Ms. Leal then mixed the sperm samples of both swabs in an attempt to obtain larger amounts of DNA material. The epithelial cells from the mixed samples were again inconclusive. The sperm cells from the mixed samples also produced a partial DNA profile that could not exclude [the Petitioner] as a contributor.

[The Petitioner] testified in his defense. He denied touching A.C. inappropriately. He also denied ever being alone with A.C. and her brother. According to [the Petitioner], either Mother or her mother would be at home when the children returned from school. [The Petitioner] confirmed that one of his brothers lived with them at the second location and that a different brother lived with them at the third location. However, [the Petitioner] agreed that neither of his brothers had contact with A.C. [The Petitioner] suggested that A.C. made up the allegations because the day before she made the disclosure at school, he bought a video game for A.C.'s brother but did not get anything for her, and she got upset. On another occasion, A.C. became upset because [the Petitioner] did not buy her a birthday cake.

*Guevara*, at *1-4.

## B. Post-Conviction Proceedings

The Petitioner filed a *pro se* petition for post-conviction relief, which appointed counsel later amended, alleging that he had received the ineffective assistance of counsel. He contended that trial counsel ("Counsel") was ineffective for failing to: (1) call certain family members or co-workers as witnesses; (2) cross-examine a witness about his statement to DCS; (3) employ a forensic expert in the field of child sexual abuse allegations; and (4) adequately communicate with the Petitioner about the case.

The following evidence was presented at a hearing on the petition: The Petitioner testified that he was tried in this case in July of 2011. The Petitioner testified that Counsel did not meet with him once during the time the Petitioner was incarcerated before trial and while he was out on bond. He stated that Counsel did not hire an investigator and only communicated with the Petitioner at court hearings when he had an

offer from the State to convey.  The Petitioner also stated that Counsel did not communicate with him via letters or phone calls.

The Petitioner testified that, at trial, Counsel did not put on additional witnesses, other than the Petitioner himself, although the Petitioner wanted Counsel to talk to the Petitioner's family, particularly his brother-in-law, about what he had seen happening during the time of the offenses.  The Petitioner testified about other family members or co-workers who he wanted to testify at trial on his behalf; several of those witnesses lived with the Petitioner and the victim at various points.  He stated that Counsel did not explore what these witnesses knew and that, for example, his sister-in-law could have testified that she would never have allowed this type of child sex abuse to occur in her home.

As for a forensic child psychiatrist or other expert on child sex abuse allegations, the Petitioner testified that he wished to present evidence refuting the victim's credibility with regard to her claims, but Counsel never explored that option.  With regard to the plea negotiations with the State, the Petitioner recalled receiving an offer to serve twenty-five years, and a later offer of ten years.  He rejected them both because he was innocent.  The Petitioner generally complained that Counsel did not do his job and did not represent the Petitioner professionally.

On cross-examination, the Petitioner agreed that Counsel visited him one time in jail, and he agreed that he received visits from another attorney working on his case.  The Petitioner remembered coming to court monthly and meeting with Counsel each time; he stated, however, that Counsel "never" talked to him about his case.  The Petitioner denied being conveyed an offer of ten years of probation by the State, saying it was "fake."  The Petitioner said he did not pay attention to what Counsel was telling him about the State's offers because he wanted to "fight the case."  The Petitioner recalled being told that there was DNA evidence implicating him, because the DNA was from his paternal lineage, but he said the results were always explained to him only as a possibility.  The Petitioner explained that he had not called the character witnesses to testify at his post-conviction hearing.

Counsel testified that he was a criminal defense attorney practicing since 1984.  The Petitioner's family approached Counsel's law partner, a fluent Spanish speaker, to represent the Petitioner.  Counsel and his law partner met with the Petitioner together while the Petitioner was in jail; Counsel's partner sometimes visited the Petitioner alone.  Counsel testified that his file on the Petitioner's case had been destroyed either in a flood or for privacy.  Counsel recalled discussing the facts of the case and potential defenses with the Petitioner.  He testified that he would have explained to the Petitioner his possible sentencing exposure at trial, particularly because the worst-case scenario was the

7

Petitioner receiving a sentence of hundreds of years. The Petitioner appeared to understand, and they had extensive conversations, including discussing the victim's motive. Counsel recalled that, "amazingly," the State offered the Petitioner a ten-year probation sentence before the DNA evidence was sent off for analysis. Counsel said it was "shocking" that the Petitioner would not accept the offer, so he asked the Petitioner to sign a form acknowledging his refusal to accept. Counsel's law partner witnessed the Petitioner sign the acknowledgement.

Counsel testified that when the DNA results came back, the State's case was considerably strengthened. Based on the positive match to the Petitioner's paternal lineage, Counsel investigated where the Petitioner's father and brother were during the time period of the abuse. His recollection was that the brother was not around and the father lived in another state. His conversations with the Petitioner about his male relatives excluded their presence at the victim's home and their possibility as suspects. Counsel asked the Petitioner for the names of every adult in the household during the abuse and Counsel interviewed them. The victim's mother was determined not to be a good defense witness. Counsel said that none of the witnesses he interviewed could testify that the Petitioner had never been alone with the victim, nor could they account for their whereabouts throughout the entire time period of abuse. As such, Counsel decided that calling them as witnesses would have been futile, particularly because they could not provide any alibis.

Counsel testified that he did not consider hiring a forensic expert because he did not feel one was relevant or necessary, and the Petitioner never asked for one. Counsel testified that he did not file a motion to suppress because there was no legal basis for the same. As for a bill of particulars, Counsel could not recall if one was filed or if the State made an election of offenses. As for the Petitioner's decision to testify, Counsel stated that the Petitioner had not been prepped to testify because the entire legal team and the Petitioner all agreed he would not be a good witness. Counsel thought that it would be very harmful for the Petitioner to offer his version of events, which was asserting in front of the jury that the victim was seeking revenge for him not buying her a birthday cake. Counsel did not know that the Petitioner would testify until moments before he took the witness stand.

Following the hearing, the post-conviction court issued an order denying the Petitioner relief. Relative to the Petitioner's claim in this appeal, the post-conviction court made the following findings:

> First, the Petitioner contends that [Counsel] was deficient . . . because he failed to call a number of witnesses as part of the defense proof. . . . . The Court has not heard testimony from any of these proposed

8

witnesses at the evidentiary hearing. While the Petitioner has made claims about what the witnesses would have testified to, the Court cannot rely on the Petitioner's summaries of that proposed testimony to allow the Court to evaluate the issue of prejudice. However, even if the Court were to accept the Petitioner's proffered summary of the proposed testimony as sufficient to fairly raise this issue, the Court still would find that [Counsel] was not deficient in his performance. [Counsel] testified that the defense team interviewed everyone who has lived in the house with the Petitioner and the victim during the time[]frame in which the offenses occurred. None of those witnesses could say that the Petitioner and the victim were never alone together, as the Petitioner has suggested. It was a reasonable tactical decision for [Counsel] to believe calling a number of witnesses whose testimony did not actually prove anything would not have been beneficial to the Petitioner's defense. Thus, the Court finds that [Counsel] was not deficient for failing to call any of the named witnesses, and the Petitioner is not entitled to relief on this ground.

Next, the Petitioner claims that [Counsel] was ineffective for failing to employ a forensic psychologist or psychiatrist to testify as to the credibility of the victim. Similar to the [first issue], the Petitioner has failed to present any evidence at the instant hearing to show how such expert testimony would have benefited his defense. Thus, the Petitioner is not entitled to relief on this ground.

Next, the Petitioner claims that [Counsel] failed to adequately communicate with him and prepare for trial. . . . . The Court respectfully disagrees with the Petitioner's contentions on this ground. While the Petitioner testified on direct examination that neither [Counsel] nor [his partner] came to visit him in jail while the case was pending, on cross-examination, he admitted that he had at least two visits at the jail, in addition to speaking to [Counsel] at his court dates. . . . . Further, to the extent there is a discrepancy between the Petitioner's testimony and [Counsel's] testimony regarding the degree to which they spoke about the case and trial strategy, the Court accredits [Counsel's] testimony. In addition to speaking about potential offers, [Counsel] testified that he spoke with the Petitioner about the nature of the charges against him and his possible exposure. Further, once the DNA results came back, [Counsel] asked the Petitioner about the possibility that another one of his male relatives could have been an alternative suspect. While [Counsel] acknowledged that they did not prepare the Petitioner to testify, [Counsel] explained that was because the entire defense team, including the

Petitioner, had agreed during their trial preparations that the Petitioner would not testify. The Court cannot fault [Counsel] for failing to prepare the Petitioner to testify when the Petitioner changed his mind and decided to testify moments before he took the stand. Thus, the Court finds that [Counsel] was not deficient for failing to adequately communicate with the Petitioner about the case.

Similarly, the Court finds that [Counsel] was not ineffective for failing to mount a credible trial defense. [Counsel] testified that once the DNA evidence came back indicating that the sperm found during the medical legal examination was from either the Petitioner or another male member of his father's lineage, he focused his defense efforts on identifying a possible alternative suspect from among the Petitioner's male family members. In addition to asking the Petitioner about his father and brothers, [Counsel] testified that the defense team investigated whether they could present any of the Petitioner's family members as possible alternative suspects. While the investigation ultimately revealed that none of the Petitioner's relatives were viable alternative suspects, in light of the evidence in the case, the Court is of the opinion that this was a reasonable tactical decision by [Counsel] well within the range of competence. Further, the Court finds that it was a reasonable trial strategy for [Counsel] to simply try to generate reasonable doubt through cross-examination of the State's witnesses, rather than calling the Petitioner to state that the victim fabricated the claims because he did not buy her a birthday cake. Accordingly, the Court finds that [Counsel] was not deficient in failing to prepare a trial strategy.

The Petitioner also claims that [Counsel] was ineffective for failing to file . . . a motion to request a bill of particulars, . . . . The Petitioner is not entitled to relief on [this ground]. [T]he Court finds that the Petitioner has failed to meet his burden of proving how he was prejudiced by [Counsel's] failure to see a bill of particulars.

Finally, the Petitioner argues that he is entitled to a new trial because [Counsel] failed to ensure the trial court instructed the jury on a number of lesser-included offenses. The Court finds that the Petitioner is not entitled to relief on this ground. Contrary to the Petitioner's assertion, the Court instructed the jury on all of the lesser-included offenses that the Petitioner has mentioned aside from child abuse. Further, the transcript reflects that the State mentioned in passing the prospect of instructing the jury on the lesser-included offense of child abuse, but neither the Court nor the parties

pursued including that lesser-included offense. Even if the jury would have been charged on the lesser-included offense of child abuse, the Petitioner has failed to show establish how he was prejudiced by the instruction not being included. The Petitioner's defense, in light of his testimony, appeared to be . . . that absolutely nothing occurred between he and the victim. Accordingly, the Court finds the Petitioner was not prejudiced by the absence of the charge of the lesser-included offense of child abuse.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition because he received the ineffective assistance of counsel. He contends that Counsel was ineffective for: (1) failing to interview and call material witnesses; (2) failing to communicate with the Petitioner to prepare a credible defense or strategy for trial; and (3) failing to request a bill of particulars and a jury instruction on lesser-included offenses. He claims that the cumulative effect of Counsel's deficient representation entitles him to a new trial. The State responds that the post-conviction court properly denied relief to the Petitioner on his claims of ineffective assistance of counsel, and that he is not entitled to relief on any of the claims in his post-conviction petition. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2018). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2018). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against them. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely *de novo* review by this court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The

following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones

based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## A. Failure to Call Material Witnesses

The Petitioner claims that Counsel was ineffective for failing to call multiple character witnesses, i.e., his relatives and friends, as well as a forensic expert on child sexual abuse allegations.

Relative to this claim, the post-conviction court found that the Petitioner had failed to meet his burden of proving prejudice because he did not present any of the proposed witnesses at the post-conviction hearing and the post-conviction court therefore could not review their proposed testimony and its impact.

The evidence does not preponderate against this finding. A petitioner is not entitled to relief from his conviction on this ground unless he can produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called. Otherwise, the petitioner fails to establish the prejudice requirement mandated by *Strickland*. *Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990).

As we have noted, the Petitioner is responsible for presenting at the post-conviction hearing the witnesses whose testimony he claims would have changed the outcome of his trial. *Black*, 794 S.W.2d at 757-58. His failure to do so by rule dictates that he falls short of proving the required standard of prejudice, *id.*, and is therefore not entitled to relief on this issue.

## B. Failure to Communicate/Prepare for Trial

The Petitioner contends that Counsel was ineffective for failing to communicate with him, failing to "mount a defense" for trial, and failing to prepare a strategy for trial. The post-conviction court found, with regards to these claims:

13

While the Petitioner testified on direct examination that neither [Counsel] nor [his partner] came to visit him in jail while the case was pending, on cross-examination, he admitted that he had at least two visits at the jail, in addition to speaking to [Counsel] at his court dates. . . . . Further, to the extent there is a discrepancy between the Petitioner's testimony and [Counsel's] testimony regarding the degree to which they spoke about the case and trial strategy, the Court accredits [Counsel's] testimony. In addition to speaking about potential offers, [Counsel] testified that he spoke with the Petitioner about the nature of the charges against him and his possible exposure. Further, once the DNA results came back, [Counsel] asked the Petitioner about the possibility that another one of his male relatives could have been an alternative suspect. While [Counsel] acknowledged that they did not prepare the Petitioner to testify, [Counsel] explained that was because the entire defense team, including the Petitioner, had agreed during their trial preparations that the Petitioner would not testify.

. . . .

[Counsel] testified that once the DNA evidence came back indicating that the sperm found during the medical legal examination was from either the Petitioner or another male member of his father's lineage, he focused his defense efforts on identifying a possible alternative suspect from among the Petitioner's male family members. In addition to asking the Petitioner about his father and brothers, [Counsel] testified that the defense team investigated whether they could present any of the Petitioner's family members as possible alternative suspects. While the investigation ultimately revealed that none of the Petitioner's relatives were viable alternative suspects, in light of the evidence in the case, the Court is of the opinion that this was a reasonable tactical decision by [Counsel] well within the range of competence. Further, the Court finds that it was a reasonable trial strategy for [Counsel] to simply try to generate reasonable doubt through cross-examination of the State's witnesses, rather than calling the Petitioner to state that the victim fabricated the claims because he did not buy her a birthday cake.

The evidence does not preponderate against these findings. Counsel testified that he and his law partner met with the Petitioner multiple times, in jail and at the courthouse, and informed him specifically of his sentencing exposure at trial and his options in light of the State's various offers. In preparation for trial, Counsel attempted to establish the Petitioner's innocence by way of interviewing the others present in and

14

around the victim's family home, in the hopes of securing testimony that excluded the possibility of the Petitioner being alone with the victim; that testimony was not available from any potential witness. As the evidence mounted against the Petitioner, Counsel went on to explore other possible DNA contributors who could be used to place reasonable doubt in the jury's mind of the Petitioner being the abuser. No one sharing the Petitioner's DNA had been around the victim and so the possibility of the Petitioner's relatives being guilty was no longer viable. All the while, Counsel fielded offers from the State, including a very favorable one, which he presented to the Petitioner. This representation falls within the "wide range of reasonable professional assistance" and is entitled to deference on appeal. Accordingly, the Petitioner is not entitled to relief.

## C. Failure to Request Bill of Particulars and Jury Instruction on Lesser-Included Offense

The Petitioner claims that Counsel was ineffective for his failure to request both a bill of particulars and a jury instruction on lesser-included offenses. The post-conviction court found that the Petitioner had not demonstrated how he was prejudiced by Counsel's failure to request the bill of particulars. As for the complaint about the jury instruction, the post-conviction court found that, in fact, the trial court had instructed the jury on the applicable lesser-included offenses, save child abuse, which the post-conviction court found was not applicable in light of the fact that the Petitioner claimed no contact at all with the victim.

The evidence does not preponderate against the findings of the post-conviction court. Counsel testified that he did not remember whether or not he had filed a motion for a bill of particulars. The Petitioner did not present any evidence at the post-conviction hearing on this issue. Without any evidence presented on which to judge this claim, we agree that the Petitioner has not met his burden of proving prejudice, and accordingly, he is not entitled to relief. We reach the same conclusion with regard to his claim about lesser-included offenses in the jury instructions. Counsel was not questioned about whether or not he requested certain lesser-included offenses, and the Petitioner did not testify about this issue. The evidence does not preponderate against the finding that the trial court properly instructed the jury with regard to certain lesser-included offenses and, thus, Counsel was not ineffective for failing to make additional requests.

## III. Conclusion

After a thorough review of the record and the applicable law, we conclude the post-conviction court properly denied the Petitioner's petition for post-conviction relief. In accordance with the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____

ROBERT W. WEDEMEYER, JUDGE